FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/07/2010

JAMILAH A. SMITH was interviewed, via a proffer agreement, at the UNITED STATES ATTORNEY'S OFFICE, 401 Market Street, 4th Floor, Camden, New Jersey 08101.  Present for the interview were Assistant United States Attorney (AUSA) R. STEPHEN STIGALL, Defense Attorney TROY ARCHIE, and FEDERAL BUREAU OF INVESTIGATION (FBI) Special Agents (SAs) SCOTT T. STEFANOWICZ and JENNIFER C. BARNARD.  After being advised of the identities of the AUSA and the interviewing agents and the nature of the interview, SMITH voluntarily provided the following information:

SMITH completed one semester of college at MONTCLAIR STATE UNIVERSITY.

SMITH heard about buying properties ███████████████
██████████████████████.  There was an advertisement that advertised buying properties with good credit scores, and which provided a telephone number to call.  ███████████████
██████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████ (another individual) (D'Andrea)

SMITH was present when ████████ spoke to ROBINSON for the first time.  ███████████████████████████SMITH overheard their conversation.  During the initial telephone conversation, ROBINSON ████████████ that he could not purchase (said) properties himself because he would not qualify.  According to SMITH, it was a long conversation during which ROBINSON seemed down to earth and wholesome.  The conversation took place before SMITH ever did any properties with ROBINSON.

ROBINSON sounded like a nice guy.  ROBINSON was an ex football player, who got involved in real estate after a company he invented something for ditched him and did not pay.  SMITH believes ROBINSON's relationship with that company was the reason he did not have good credit himself.

---

| Investigation on | 12/30/2009 | at | Camden, New Jersey |
|---|---|---|---|

File #

SA Scott T. Stefanowicz STS

Date dictated

by   SA Jennifer C. Barnard/jcb

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____JAMILAH A. SMITH_____ , On 12/30/2009 , Page ___2___

        ROBINSON wanted to set up a partnership with SMITH.
SMITH had the credit score, approximately 720 at the time, and
ROBINSON had the know how.  ROBINSON told SMITH he needed her
social security account number to add SMITH as an employee and to
set up the partnership, R & J Property Investment Group, LLC.

        SMITH did not speak to ROBINSON much regarding the
property she purchased in Kearney, Missouri.  SMITH trusted
ROBINSON.

        Touchmark Development, LLC, who was selling the property
in Kearney, Missouri, needed to sell it to someone with good
credit.  ROBINSON told SMITH all she needed to purchase the
property was a good credit score.  SMITH could not remember if she
physically looked at the property or was just shown a picture of
the property.

                                        , SMITH made a        trip to
Missouri to attend the closing for 16820 NE 179th Terrace, Kearney,
Missouri, 64060.  SMITH looked at the loan application at the
closing, but does not remember the title clerk going through and
verifying her income or the amount of money in her bank account.
The signature on the loan application should belong to SMITH.

Case 1:10-cr-00184-JBS   Document 68-2   Filed 07/01/11   Page 18 of 30 PageID: 598

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____JAMILAH A. SMITH_____ , On _12/30/2009___ , Page ___3____

SMITH assumed the information on the loan application was provided by ROBINSON.

As far as SMITH knows, the property is in foreclosure.  SMITH thinks any notices regarding 16820 NE 179th Terrace, would have gone to her Irvington, New Jersey address.

SMITH received $12,000 or $12,500 for buying 16820 NE 179th Terrace.  The seller gave ROBINSON money and then ROBINSON gave SMITH money.  According to SMITH, she was naive and thought all she needed to buy properties was a good credit score.  SMITH trusted ROBINSON                                          and seemed fine to her.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____JAMILAH A. SMITH_____ , On _12/30/2009_ , Page ___4____

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████ SMITH referred to Darryl LNU as "Kato".

The first time SMITH ever spoke to Darryl LNU was when she was on her way to the closing for 340 E. 21st Street, North Wildwood, New Jersey, Unit 6. ████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

SMITH met Darryl LNU at the closing for 340 E. 21st Street, Unit 6.  Prior to the closing, SMITH did not speak to anyone or fill out a loan application.  SMITH assumed Darryl LNU did her loan application.  SMITH remembered giving ROBINSON copies of her bank statements, but did not remember giving Darryl LNU anything. ████████████████████████████████████████
████████████████████████████████

Before the closing started, the title agent and Darryl LNU were waiting for money to arrive.  Darryl LNU told SMITH someone was coming with the missing funds.  The title agent never asked SMITH for the money.

(Writer's Note: SMITH was shown a photograph of TIM RICKS, and responded as follows:)  He was there at the beginning of the closing ███████████████████████████████ He may have a restaurant.  He came to the closing and brought the money or confirmed a wire.  He dropped off whatever or verified whatever.

At the closing, Darryl LNU told SMITH she would receive enough money to cover six months worth of mortgage payments. ██████
██████████████████████████████████████████████████ SMITH was responsible for making the mortgage payments on the property.

SMITH was also going to receive a $10,000 bonus, to be used to hire a property company to find renters for the properties, to set up the utilities, and to buy furniture for the properties.

Exhibit D 4

Case 1:10-cr-00184-JBS   Document 68-2   Filed 07/01/11   Page 20 of 30 PageID: 600

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____JAMILAH A. SMITH_____ , On _12/30/2009__ , Page ___5____

[REDACTED]

      The female at the closing table went over her loan application.  R & J Property Investment Group, LLC looked familiar, [REDACTED] SMITH assumed R & J Property Investment Group, LLC was on the loan application because she was going to do a partnership with ROBINSON.  SMITH thinks when verifying her employment, ROBINSON must have said she worked there, otherwise the deal would not have gone through.  SMITH did not give anyone any information for her loan application and assumes that any loan application information would have had to have come from [REDACTED]  No one ever asked SMITH about a real job. [REDACTED]

      Everyone at the closing knew what was on the application and acted like it was business as usual. [REDACTED]

[REDACTED]

      JIM HANSON was present for most of the closing. [REDACTED]

      After the closing, SMITH realized she had eight or nine missed calls from Darryl LNU.  Darryl LNU was having problems getting in touch with ROBINSON to verify her employment.  Darryl LNU sounded panicked that the deal would not go through.  Darryl LNU had been calling SMITH to see if she could contact ROBINSON.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ JAMILAH A. SMITH _____ , On 12/30/2009 , Page ___ 6 ____

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

        HANSON, the female title clerk, ██████████ and SMITH were
present for the second closing, however, Darryl LNU was not.  The
title clerk did not ask SMITH for $46,000.  Unlike at the first
closing when they were scrambling around until the guy showed up,
money was not even discussed this time.  This time everything was
smooth.  SMITH assumes the title clerk verified her loan
application with her, however, she did not remember a WACHOVIA BANK
account on her loan application.

        The paperwork was completed before SMITH got to the
closing and everything was already set in stone.  It seemed to
SMITH that everyone at the closing was following procedure. ██████
████████████████████████████████████████████████████████████

        (Writer's Note: SMITH was shown a copy of a letter "To
whom it may concern" regarding inquiries on her credit, and
responded as follows:)  I remember signing something like that at
the first closing, but that is not my handwriting.  According to
SMITH, it seemed like it was something Darryl LNU gave her.  SMITH
stated that if the letter was something in the file for the second
closing, the title clerk might have done it.  SMITH recalled
signing a letter like that, but could not recall at which closing
it happened.

Exhibit D 6

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____JAMILAH A. SMITH_____, On 12/30/2009 , Page ____7____

SMITH received around $60,000 for buying the properties. Darryl LNU gave SMITH a check but when the check did not go through, he wired the money to her.  SMITH received around $30,000 per property, which was to be used to cover mortgage payments.

If any loan documents came to her house, SMITH just put them to the side.  SMITH was not dealing with that part of the purchase.

Darryl LNU told SMITH there were people lined up to purchase the condominiums, and to contact him if they had any problems.

SMITH has seen a list of others who were living in the building.

Exhibit D 7

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____JAMILAH A. SMITH_____ , On _12/30/2009__ , Page __8__

SMITH did not use all of the $60,000 she received for mortgage payments. ████████████████████████

When SMITH could not sell the properties the conventional way, she started doing things with bonded promissory notes.  SMITH used some of the money she received from Darryl LNU to pay bills, utilities, etcetera, and some of the money for paperwork and postage relating to the bonded promissory notes.

SMITH gave $25,000.00 to A DAY IN HOLLYWOOD, which according to SMITH, was a private placement program belonging to JOANNE HOLLY.  SMITH was supposed to get a return on her investment, but she did not.  One of the reasons she chose A DAY IN HOLLYWOOD, was because SMITH could get her money back.  SMITH got her money back, but does not believe that everyone who invested with A DAY IN HOLLYWOOD got their money back.  HOLLY did not come through, but was probably making money the whole time.

SMITH had been doing private placement programs since 2004.  Someone SMITH had invested with was RICHARD BYRNE.  BYRNE's private placement program was called FUN TIME NOW.  People gave him their money and maybe someone stole it, because he is currently under investigation.

GADDEL (phonetic) ENTERPRISES was another investment.  Someone in the family knew about GADDEL ENTERPRISES.  SMITH put money down, and thought it was part of a bid on a property.  When the property sold SMITH was supposed to get a percentage yield from the sale, however, there was never any real estate to begin with.

████████████████████████████████████████

973-951-8459 was SMITH's old cellular telephone number. 404-683-9976 is SMITH's new cellular telephone number.  Darryl LNU knew SMITH was living at the house on Laurel Avenue.

████████████████████████████████████████

Exhibit D 8

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___JAMILAH A. SMITH_____ , On _12/30/2009_ , Page __9__

       SMITH never spoke to JIM VETTER.

Exhibit D 9